May it please the Court, my name is Wendy Holton. I represent Mr. Rivera-Munoz. An accurate guideline calculation is required in every sentence proceeding. And the guideline calculation in this case is incorrect in two respects. First, the drug quantity, which is what essentially drives the offense conduct in the sentencing guidelines. And second, Victor was erroneously given three points based on the determination that he was a manager or supervisor. Additionally, the District Court erred by not adjusting his sentence downward for time that he had already served on a related felon in a firearm case. And I'd like to talk about that a little bit initially. In this case, Victor was arrested initially in February of 2016 based on an allegation that he was a prohibited person in possession of a firearm. He was ultimately sentenced in that case in November of 2016 and was given a sentence of 21 months. That sentence would have expired sometime between July and September of 2017. But in June of 2017, before that sentence had expired, Victor was charged in this case. By time of sentencing, though, it had expired, correct? By the time of sentencing, it had expired. But that's the factor that essentially distinguishes this case from, for example, turnip seed. In turnip seed... Well, but do you have a case that says that a sentence that is served by the time the sentence is imposed but had expired prior to that meets the requirements of the guidelines? Do you have a case that says that? I don't have a case either way on that. Well, but we do have a case, turnip seed, that says if the sentence has been completed by the time of sentencing that the guideline provision does not apply. So how do you get around that if you don't have a case that distinguishes the guideline in the way that you're urging us to adopt? Oh, I think that there is an ambiguity in the term undischarged sentence. In this case, in fact, Judge Waters did apply application note 2D when she says, I'm going to run the portions of these after he was charged in this case concurrently, but I'm not going to give you credit. I'm not going to adjust the sentence downward. It seems to me that what that acknowledges is a trigger of application note 2D. Well, not a trigger. She just had discretion to consider all of the circumstances in terms of imposing sentence, but that doesn't mean that she decided that the guideline provision applied. I think that she thought that based on what she said at the time, if I interpret that as her saying I don't think that I did have discretion. Why don't you address the other issues that you've raised? Okay. The other issue, the other two issues, of course, the first is the drug quantity. As you are aware, we objected to the drug quantity that was determined in the pre-sentence report. What's our standard of review when we're reviewing the district court's determination of drug quantity? What's our standard of review? Well, the standard that the district court is bound by is preponderance of the evidence. What's our standard when we're reviewing that? Yours is an abuse of discretion, I believe. Abuse of discretion. Wouldn't it be clear error? It's clear error on the facts, abuse of discretion on whether to apply the way in which the guideline was applied, I think. In this case, once I objected, it became incumbent on the government to present evidence. Or at least it has to be reliable. There has to be reliable evidence. Right. And the evidence that was presented at the sentencing hearing regarding the issue of quantity was the testimony of Jeanette and Raymond Schott, who Victor lived with for three months. And the spreadsheet. And the spreadsheet. And the spreadsheet, I think that one of the critical factors about the spreadsheet was that it was created very shortly before this whole thing came crumbling down. But let me ask you, you don't have to worry about the spreadsheet because the district court judge himself said he didn't use the spreadsheet to determine quantity, he used it to determine price. Isn't that correct? Well, she talked about the spreadsheet, and she said, well, I'm not sure that that reflects anything because. She didn't use it to do the calculation for quantity. She only used it to determine the price. It was like $222 and some odd cents per ounce, right? I think she said there could be more drugs out there, but this is just based on the price issue. What do you understand that she relied upon to come up with three kilograms? I think that what she relied upon is. There was some evidence, there was. In fact, they stipulated, the argument here is that there was at least, what, 1.5 to. Right, and where my argument was that even though Victor lived with Jeanette and Raymond, that during this entire time he lived with them, what they saw was one large quantity of methamphetamine. What was in a Pampered Chef pie plate that was estimated to be between two and three pounds. No, there was also the fact that he was giving them initially, he was selling to them one ounce of methamphetamine for a period of time, and then there was a period of time thereafter that he was giving them four ounces in exchange for their youth, Well, I guess my point on that would be that they never saw more than that one big pie plate, and what that would have totaled is between 12 and 15 ounces, which totally could be included in what was in the pie plate. Presumably the conspiracy wasn't to get methamphetamine for just Jeanette and Raymond, it was to sell it to other people as well. So the fact that he's giving them a certain amount, that amount one would think would dwarf the total amount that he was dealing in. And so if you look at it that way, there has to be more than three kilograms of methamphetamine involved in this case. Well, every amount that is documented in this case by people who say this is what Victor gave me, the totality of it wouldn't be more than two or three pounds. That would be a credibility determination and a reliance determination, because again, we have not only the Schnecks, if that's how you pronounce their last name, but we also have, what's her name, Cameron Kahnjani, and also Ms. Lyman, who are also saying that they got ounces from the defendant. But even if you add their 10 ounces and seven ounces, I think, respectively, it still doesn't add up to more than two. But then we also have the defendant's own statements where he was saying that at one point, time to one of them, that he was bringing in 20 kilos of methamphetamine each time he brought the substance into Montana. Your Honor, I think that that statement from one of the co-defendants shows how wildly speculative all this is. She said this is what he said. Why is that speculative? Let me stop you. Why is that speculative when she says that's what he told me? Why is that speculative? Well, first of all, there's nothing to challenge. She wasn't presented at sentencing, and I wasn't able to challenge her credibility. And the other piece of it is that Jeanette Schott said, well, he said he was bringing in a kilo at a time. So those are just wildly different amounts that show how speculative all of this is and that we need to base it on facts. And your argument with respect to the guideline, the manager-supervisor? With regard to the manager-supervisor, the guidelines require that he have some control over anybody, and the evidence in this case clearly doesn't establish any control. Nobody did what he asked them to do. Anybody who tried to do what he asked them to do didn't necessarily get it done. There were no ramifications for that. But Jeanette did. Jeanette did what he was told. But everything there shows equal or perhaps superior bargaining power on her part. He gave the methamphetamine to her. She didn't control any of it. He gave it to her. He instructed her at one point in time to collect the debt, although arguably we don't know whether that debt was actually related to the methamphetamine or to something else. And there are a lot of individuals who are supposedly involved in this matter who looked at the defendant as being their ringleader, so to speak. There's nobody but Jeanette and Raymond who testified, and they said, well, we thought he was the top guy. That's a matter of opinion. That's not proof. And what the evidence does establish is that Jeanette and Ray were handsomely reimbursed for anything that they did for Victor. According to Raymond, the defendant asked him to inquire to see whether or not he could find another source in Wyoming to deal in methamphetamine. And Raymond told him no. Would that request come from a low-level participant rather than somebody who is more of a manager or supervisor of the conspiracy? It might look from somebody who is looking to expand their market. But manager or supervisor implies an inequity of bargaining power, and that just isn't what happened here. Okay. I'll give you some time for rebuttal. Thank you. Let's hear from the government. Good morning. May it please the court. My name is Julie Patton, and I represent the United States. I first want to address the issue of the drug quantity calculation. The court did not clearly err when it relied upon the testimony presented by Jeanette Schacht with regards to these trips and the kilos he was obtaining on those trips. So how did the district court get to 4 kilograms and then say, well, just to be cautious and careful here, we're going to cut it down to 3 kilograms? She had semi-basis in which to say there was 4. So how do we get to 4? We know there were 4 trips taken during the time that he lived with the Schachts, from November of 2015 to February of 2016. And the court really confined its determination to the 3 trips that the Schachts rented a vehicle for him, knowing that when he returned, he provided them the 4 ounces, which included that 3 ounce of methamphetamine. Right. That's 7 ounces. Well, I – Well, how much was it? Well, I think we should look to that conversation that Jeanette Schacht testified to regarding the spreadsheet, the creation of that spreadsheet. She sat down with him in January. But again, the judge didn't rely on the spreadsheet for quantity. That's the problem. No, but I think she relied on that conversation. But counsel, are we limited – when we're reviewing the decision of the district court judge, are we limited to the evidence explicitly relied upon by the judge, or can we look at the entire – are we allowed to look at the entire record before the district court? We're allowed to look at the entire record. Yeah. And I believe that the court looked to not only what was presented at sentencing, but also her experience as the presiding judge. Wait a minute, wait a minute, wait a minute. So since I can't add, why don't you just tell me how you get – how she got to 4? The 4 trips – Add it all up for me. 4 trips, it was his business model to get a kilo on each trip and bring that back. Okay, so that was – was there evidence that he brought back? Did somebody see the kilo each time he came back? No. All right. What do we know – what is the basis for saying that when he went to California, he brought back a kilo? The court looked to the fact that this was the only reason that he returned to Montana. I thought there was evidence that he went back to California with his brother one time. He did. He did have these reasons for going to California. Did he also say that he was in Montana because he had a relationship with somebody in Montana? I believe he did, but I don't know that that's contained within the record. I know that – Contained within the – Presentence report. Presentence report. He had a relationship and a child. But the court looked to the fact that the real reason that he was in Montana – she was under no illusion. The reason he was in Montana was to distribute methamphetamine. Well, nobody disputes that. It's the amount. It is the amount. It's the amount. But this is his business model. He pled guilty. And I think the timing of this conversation is key here, too. This conversation that Jeanette has with Victor occurs in January of 2016. We know at this point that he's at least taken two, if not three, trips to California. And he tells her he's brought a kilo of methamphetamine back. And that's the purpose of creating this spreadsheet is he's owed some money for that. And so I think the court, in a conservative estimate, decided to look just at those three trips that the Shocks basically rented the vehicle for him and got the free ounce in return. Okay. Unless there are any other questions on the drug quantity, I'll move on to the manager supervisor. And the court did not abuse its discretion when it applied this enhancement. Again, this court understood this conspiracy. She presided over all 12 cases. And I think there are five key areas that Mr. Rivera exercised control. His decision-making authority. He was the one going to California and returning with the methamphetamine. He decided how much. He decided who got it and at what point. Then we look at the recruitment of co-conspirators. He recruited two dealers. He recruited the Shocks. He tried to recruit people in Wyoming. And then we look at the control he just exercised over the Shocks alone. Jeanette was his landlady, his bookkeeper. He used their home and their vehicles for his business. Glamorizing her as a bookkeeper in that instance. She did it once. She did create an accounting for his business. Did he tell her what to do? Yes, he told her to rent vehicles on his behalf. He told her to write that off. Didn't he pay for them? Didn't he reimburse her? Right, but just the fact that you're paying for something doesn't mean you're not exercising control, much like an employer-employee. And then we look at the fact that there was this false letter of employment for the brother-slash-bodyguard that he directed Ed to write. And then we move on to the fact that he's asking Jeanette to collect a drug debt on his behalf from the jail. We don't know if it's a drug debt. We just know it was a debt. Well, he doesn't have any other job, so it's presumed it's a drug debt. But there was something involving a truck, wasn't there? I believe so. He said he was owed a truck, yeah. But that's not the only one he's trying to control there when it comes to these debts. He asked Richard Scheidel to collect a drug debt, and he's thwarted by police. And he also has a jail call with one of the other co-conspirators where he's telling her to talk to Angel to get more money. And then we look at the whole organizing of this in general. The drug ledger shows that he's fronting methamphetamine to other dealers within the conspiracy, and that ledger also shows that he's making a significant profit off of that. Jeanette Schock testified that he, on theirs, was getting an 80% profit from them alone. And I think if we're going to move on to the fact of the discharge versus undischarged sentence, I think we have to look to the fact that we do not have a record whether the court considered the discharge sentence in her determination in her downward departure of the sentence because it was not raised below 5K2.23 was not raised by defense counsel at sentencing. So the court was not required to basically pronounce that when she did depart downward. And she properly applied 5G1.3 and determined that she was not required to apply that here. So unless the panel has any other questions, I'll rely on our briefs. Okay. Thank you. Thank you, Your Honor. Regarding the trips, there was evidence that Victor had other reasons to go to California. His family... Well, he could have picked up the meth while he was down there. But there's not evidence of that. I mean, there's evidence that he said, I'm going to see my family in California. There's evidence that he said, I'm going to take Raymond down for court and then came back. And there's also evidence that the reason that he would come back to Montana is that at the time that the pre-sentence report was written in 2018, his baby was two years old. Counsel, you don't dispute the testimony from Jeanette that on at least one of the trips to California, he came back with a pie plate full of meth over the top. I do not dispute that there was a Pampersheff pie plate that she thought had between 2 and 3 pounds in it. But I also... My position is that that is the amount that is proved in this case. And every other amount that is documented in this case could be part of that amount. It's not more than everything else added together. Well, but if you include the... If you say it's 3 pounds or 2.4 pounds, but then you have all the other ounces that were being divvied up to other persons, you clearly can't... But there's no evidence that those ounces weren't part of that pie plate, that they didn't come out of that pie plate. Well, it was because some of it came from other times when he drove down and came back up. The four ounces that he was giving to the checks, one of them might have been from the pie plate, but the other ones, they didn't tie it in. He said after he came back, he gave it to them. Let's put it this way. You can draw circumstantial evidence if nothing else.  Everything is ounces. But Jeanette says that he was buying 2.4 pounds when he was buying. My point on that is that the ledger disputes that. The ledger was made at the end of this. It was to determine who owed him money and to determine his price. What it dealt with was one kilo of meth, 36 ounces. That was at the end of this meth. Anything else? No, Your Honor. Thank you. Thank you. Case is submitted.
judges: Paez, Rawlinson, Wu